IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

CROWN BAY MARINA, L.P.,                    )
                                           )
                                           )
                Plaintiff,                 )
                                           )        Civil No. 2018-73
        vs.                                )
                                           )
REEF TRANSPORTATION, LLC, *et al.*,        )
                                           )
                                           )
                Defendants.                )

**MEMORANDUM OPINION AND ORDER**

Before the Court is defendant Reef Transportation, LLC's ("Reef") "Motion for Summary Judgment" [ECF 131]. Plaintiff Crown Bay Marina, L.P. ("CBM") filed an opposition and cross motion for summary judgment [ECF 182][1] and Reef replied [ECF 205]. Reef also filed an opposition to the cross motion for summary judgment. [ECF 224].

## I.      STATEMENT OF FACTS

Plaintiff CBM is a Delaware Limited Partnership and the owner of Crown Bay Marina ("the Marina"), a boat docking facility located on St. Thomas in the U. S. Virgin Islands. Ver. Compl. [ECF 1] ¶¶ 3, 4. Kosei Ohno is President of the St. Thomas Marina Corporation, CBM's sole general partner. Ohno Dep. [ECF 133-2] at 12.[2] CBM acquired the Marina in approximately

---

[1] Reef has moved to strike the cross motion for summary judgment because it was filed out of time and because it does not conform to the local rules. [ECF 185]. CBM opposed the motion to strike [ECF 212] and Reef replied [ECF 237]. The Court finds that the cross motion was not timely filed, given the July 22, 2020 deadline the Court set for the filing of dispositive motions, and that CBM did not request leave to file the cross motion out of time. The Court finds additionally that CBM failed to comply with Local Rule of Civil Procedure 56.1(a), in that CBM did not file "a separate statement of material facts about which the movant contends there is no genuine issue" in support of its cross motion. The Court need not strike the pleading, however, because on the merits, as discussed below, the cross motion fails.

[2] References to deposition transcripts will indicate the page number of the docket entry, rather than the page number of the transcript.

*Crown Bay Marina, L.P. v. Reef Transportation, LLC, et al.*
Civil No. 2018-73
Page 2

1998. *Id.* at 13.  From 1998 until October 27, 2017, Dennis Kissman and his company, Marina Management Services, Inc., managed the Marina.  *Id.* at 11.  During that time, Kissman was a limited partner in CBM.  *Id.* at 13-14.

Defendant Reef is a limited liability company authorized to do business in the U. S. Virgin Islands and owner of the vessels Morning Star and Evening Star.  Ver. Compl. [ECF 1] ¶ 5; Trilling Decl. [ECF 133-1] ¶ 3.  Both vessels are 27-foot single screw harbor vessels used as water taxis. *Id.*  Reef has two members—Scott McKellar and James Trilling.  *Id.* ¶ 2.

On September 5, 2017, in anticipation of Hurricane Irma making landfall on St. Thomas, Reef employees Captain Chris Matthews, Captain Robert "Red" Ritter, and Captain Dave MacVean secured both Reef vessels in slips C-10 and C-12 at the Marina.[3]  Ver. Compl. [ECF 1] ¶¶ 11, 12; [ECF 133-1] ¶ 4; [ECF 159] at 9.  Reef co-owner Trilling inspected the vessels after they were secured and approved the tie up procedures the Reef captains used.  Trilling Decl. [ECF 133-1] ¶ 6.  Gerard Ocello, CBM's dockmaster at the time, also observed the way both Reef vessels were tied up prior to the storm.  Ocello Dep. [ECF 133-12] at 3-5.  The next day, September 6, 2017, Hurricane Irma passed over St. Thomas.  Ver. Compl. [ECF 1] ¶ 10.  Following the storm, both Reef vessels remained tied to the C Dock.  Trilling Decl. [ECF 133-1] ¶ 6; van der Heide Dep. [ECF 195-1] at 170-71.

CBM filed the instant action on September 5, 2018.  CBM alleges Reef was negligent in securing its vessels to the C Dock.  Ver. Compl. [ECF 1] ¶¶ 11, 12.  CBM also contends that the Reef vessels caused significant damage to the concrete finger piers, pilings, wooden whalers, cleats

---

[3] Matthews executed three documents for each vessel (collectively, the "CBM Agreements"):  (1) the License Agreement for Dockage ("the License Agreement"); (2) the Dayworker Agreement of Waiver of Liability and Assumption of Risk ("the Dayworker Agreement"); and (3) the Crown Bay Marina 2017 Hurricane Evacuation Protocol ("the Evacuation Protocol").  Ver. Compl. [ECF 1] ¶ 8; *see also* [ECF 1-1].

and other equipment. *Id.* ¶ 13. CBM seeks $311,566 to repair and restore the Marina, as well as other amounts. *Id.* ¶ 14.

## II.   LEGAL STANDARDS

A.   <u>Summary Judgment</u>

Summary judgment is appropriate where an examination of the pleadings, affidavits, and other proper discovery materials before the court demonstrates "there is no genuine dispute as to any material fact," thus entitling the moving party to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (explaining that "irrelevant or unnecessary" factual disputes do not preclude summary judgment). A factual dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "In considering a motion for summary judgment, a [] court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *N.H. Ins. Co. v. Diller*, 678 F. Supp. 2d 288, 295 (D.N.J. 2009) (quoting *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004)).

The movant has the initial burden of showing no genuine issue of material fact exists. *Gans v. Mundy*, 762 F.2d 338, 342 (3d Cir. 1985). Once the moving party meets this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing there is a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 323; *see Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991) (stating that the non-moving party "may not rest upon mere allegations, general denials, or . . . vague statements"); *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) ("[S]ummary judgment is essentially 'put up or shut up' time for the nonmoving party: the non-

*Crown Bay Marina, L.P. v. Reef Transportation, LLC, et al.*
Civil No. 2018-73
Page 4

moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument.").

B.      Maritime Law

District courts of the United States "have original jurisdiction . . . of [a]ny civil case of . . . maritime jurisdiction." 28 U.S.C. § 1333(1).[4] "The fundamental interest giving rise to maritime jurisdiction is the protection of maritime commerce." *Hargus v. Ferocious & Impetuous, LLC*, 840 F.3d 133, 136 (3d Cir. 2016) (quotation marks omitted). Whether admiralty jurisdiction exists is a matter of substantive federal admiralty law. *Interested Underwriters at Lloyd's v. Haulover Marine, Inc.*, 866 F. Supp. 235, 236-37 (D.V.I. 1994).

1.      Maritime Tort Claims

"For a federal court to have admiralty jurisdiction over a tort claim, the tort must (1) occur on navigable waters and (2) bear some relationship to traditional maritime activity." *Andreu v. Palmas del Mar Homeowners Ass'n, Inc.*, 311 F. Supp. 3d 456, 459 (D.P.R. 2018) (citing *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995)). Navigable waters are those which, on their own or in conjunction with others, form "a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water." *Andreu*, 311 F. Supp. 3d at 459-60 (quoting *The Daniel Ball*, 77 U.S. 557, 563 (1870)). Torts bear a relationship to traditional maritime activity if the incident could potentially disrupt maritime commerce and if "the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *Andreu*, 311 F. Supp. 3d at 460-61 (quoting *Grubart*, 513 U.S. at 534).

---

[4] Under 48 U.S.C. § 1612(a), the District Court of the Virgin Islands has the same "jurisdiction of a District Court of the United States."

Finally,

> a plaintiff asserting a maritime negligence cause of action must show (1) the existence of a duty required by law which obliges the person to conform to a certain standard of conduct; (2) a breach of that duty by engaging in conduct that falls below the applicable standard or norm; (3) a resulting loss or injury to the plaintiff; and (4) a reasonably close causal connection between the offending conduct and the resulting injury. *Id.* (alterations omitted) (quoting 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law*, §§ 5–2, at 252 (5th ed. 2011)).

*Pogan v. M/V/ Venture Pride*, 2018 WL 1548687, at *2 (D.V.I. Mar. 28, 2018) (quotation marks omitted).  Thus, the elements of a negligence claim in admiralty law are "essentially coextensive with its common law counterpart."  *Id.* (quoting *In re Frescati Shipping Co.*, 718 F.3d 194, 207 (3d Cir. 2013)).   In other words, "[u]nder the general principles of negligence, mariners are expected to exercise human skill and precaution, and a proper display of nautical skill, *i.e.*, reasonable care under the circumstances."  *Pogan*, 2018 WL 1548687, at *2 (quotation marks omitted).

2.   Maritime Contract Claims

Where the court has admiralty jurisdiction over a contract claim, the court must apply federal choice of law rules to determine the applicable law.  *Calhoun v. Yamaha Motor Corp., U.S.A.*, 216 F.3d 338, 343 (3d Cir. 2000); *accord State Trading Corp. of India v. Assuranceforeningen Skuld*, 921 F.2d 409, 414 (2d Cir. 1990) ("A federal court sitting in admiralty must apply federal choice of law rules.").   "[C]ourts apply federal choice-of-law rules by 'ascertaining and valuing points of contact between the transaction and the states or governments where competing laws are involved.'"  *Travelers Prop. Cas. Co. of Am. v. Ocean Reef Charters LLC*, 324 F. Supp. 3d 366, 383-84 (W.D.N.Y. 2018) (quoting *Lauritzen v. Larsen*, 345 U.S. 571, 582 (1953).  Those points of contact are "(1) any choice of law provision contained in the contract;

(2) the place where the contract was negotiated, issued, and signed; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties." *Advani Enters., Inc. v. Underwriters at Lloyds*, 140 F.3d 157, 162 (2d Cir. 1998).[5]

"[W]hen a maritime contract contains a choice-of-law clause, the law chosen by the parties governs . . . unless (1) that jurisdiction has no substantial relationship to the parties or the transaction or (2) that jurisdiction's law conflicts with the fundamental purposes of maritime law . . . ." *Farrell Lines Inc. v. Columbus Cello-Poly Corp.*, 32 F. Supp. 2d 118, 127 (S.D.N.Y. 1997) (citations and quotation marks omitted).  In other words, "[t]he fact that a choice-of-laws provision exists in a contract does not, by itself, remove the contract from the scope of maritime law." *Williamson v. Recovery Ltd. P'ship*, 542 F.3d 43, 49 (2d Cir. 2008).  Rather, "once a contract has been deemed a maritime contract, the next step is determining whether a specific state's laws should be used to *supplement* any area of contract law for which federal common law does not provide."  *Id.* (emphasis in original).

Here, CBM contends that it is suing Reef for breach of contract for failing to "indemnify and reimburse CBM for damages," and for breaching a "duty to name Crown Bay Marina as an additional assured."  [ECF 182] at 2, 15-19.  Paragraph 17 of the License Agreement provides that the agreement "shall be governed by, construed and enforced in accordance with the Laws of the Territory of the U.S. Virgin Islands and the United States of America."  *See, e.g.*, [ECF 133-8] at 3.  The Dayworker Agreement provides that "the laws of the Virgin Islands shall govern its terms and conditions," *see, e.g., id.* at 4, and the Evacuation Protocol does not contain any choice of law

---

[5]  When a maritime contract does not contain a choice-of-law provision, the court simply skips the first factor.  *Travelers Prop. Cas. Co. of Am.*, 324 F. Supp. 3d at 384.

provision.  Nevertheless, (1) the Evacuation Protocol was issued and signed in the Virgin Islands; (2) the agreement was performed in the Virgin Islands; (3) the subject matter of the contract—evacuation protocols for vessels stored at the Marina—is centered in the Virgin Islands; and (4) both CBM and Reef are located in the Virgin Islands.  Because "all writings that are part of the same transaction are interpreted together," *Sunshine Shopping Ctr., Inc. v. Kmart Corp.*, 85 F. Supp. 2d 537, 540 (D.V.I. 2000) (quotation marks and citation omitted), all three agreements are governed by federal maritime law possibly supplemented with Virgin Islands law.

## III.   DISCUSSION

### A.   The Parties' Arguments

Reef seeks summary judgment as to CBM's claims.  [ECF 132] at 1-3.  Reef's primary contention is that it could not possibly have caused damage to the C Dock during Hurricane Irma because following the storm both of its vessels remained securely moored in their assigned slips, because none of the vessels' mooring lines were broken, and because the vessels' fiberglass hulls were not significantly damaged.  *Id.* at 1-2.  According to Reef, this undisputed evidence demonstrates that Reef took appropriate precautions in securing its vessels prior to the hurricane. *Id.* at 2.  In addition, Reef argues that it is undisputed that the docks were in poor condition prior to Hurricane Irma and that they were further damaged by the storm.  *Id.* at 5.  Next, Reef disputes CBM's theory that the damage to the C Dock was caused by the lateral pulling of Reef's vessels on the dock structures and instead avers that properly constructed and maintained docks are built to withstand this exact type of lateral pulling during a storm.  *Id.* at 2.  Finally, Reef contends that the damages sought are too speculative to apportion any of them to Reef.  *Id*. at 16-17.

With respect to the CBM Agreements, Reef contends that it is not liable under the language of those agreements unless its vessels "caused" the damage at issue.  *Id*. at 14-15.  Reef asserts

also that "Crown Bay cannot contractually shift liability for an Act of God." *Id*. at 15-16.  Reef

thus concludes that "the Court should find that Crown Bay has failed to assert a viable claim

against Reef for breach of contract." *Id*. at 16.

CBM counters that summary judgment is inappropriate because there are genuine issues of

disputed fact regarding the condition of the Marina prior to Hurricane Irma, the occurrence of a

storm surge, the extent to which the vessels were damaged as a result of coming into contact with

the finger pier or dock during the storm, and "whether the damages were caused by defendant's

vessels."  [ECF 182] at 3-10, 12.

In its cross motion, CBM raises several arguments about the enforceability of the CBM

Agreements, arguing that "CBM is entitled to summary judgment against Reef on its breach of

contract claim," because Reef "breached its contractual duty" to provide insurance naming CBM

as an additional insured.  *Id.* at 15-19.  In opposition, Reef emphasizes that liability under the

agreements must be based on proof of causation; in other words, Reef contends that CBM must

prove that Reefs' vessels damaged the Marina.  [ECF 224] at 2-3.  Reef also points out that that

"complaint is silent as to any allegations about the insurance on the vessels," and therefore no

claim of breach based on a lack of insurance is before the Court.  *Id*. at 4.

B.      Analysis

1.      Federal Admiralty Law Applies to CBM's Claims

Claims related to the mooring of the Morning Star and Evening Star at the Marina are

governed by federal admiralty law.  First, the general features of the incident—damage to a marina

located on navigable waters allegedly caused by commercial vessels docked at that marina during

a hurricane—could potentially disrupt commercial activity.  *See Sisson v. Ruby*, 497 U.S. 358, 363

(1990) ("Here, the general features [of the incident]—a fire on a vessel docked at a marina on

navigable waters—plainly satisfy the requirement of potential disruption to commercial maritime activity."). Second, the mooring of vessels at a marina situated on navigable waters is substantially related to traditional maritime activity. *See id.* at 367 ("Clearly, the storage and maintenance of a vessel at a marina on navigable waters is substantially related to 'traditional maritime activity' given the broad perspective demanded by the second aspect of the test. Docking a vessel at a marina on a navigable waterway is a common, if not indispensable, maritime activity.").

    2.    <u>Whether Reef was Negligent</u>

    a.    <u>Whether Reef Negligently Secured its Vessels</u>

Reef contends that there are no genuine issues of material fact that it took all necessary measures in securing its two vessels to the C Dock prior to Hurricane Irma. Trilling, one of Reef's two members, stated:

> I have owned and operated motor and sailing vessels ranging in size up to 60 feet for approximately 60 years. I have personally been involved in securing vessels for named storms including hurricanes on at least 20 occasions. I personally inspected the tie up procedures used by Captain Matthews and crew on September 5, 2017 and found them to be reasonable and satisfactory. After Hurricane Irma passed, I personally inspected the Vessels and found that they remained in the slips where they were secured pre-Irma, none of the Vessels' mooring lines had broken or parted and there was no evidence either of the Vessels contacted any portion of the dock, piers or pilings to which they were secured. . . .

Trilling Decl. [ECF 133-1] ¶ 6.

CBM's Ocello also approved the method by which Reef's two vessels were secured at the Marina prior to Hurricane Irma:

> We walked the docks several times during that period to make sure people were secure and boats were properly tied, and as far as we could see, everything seemed to be okay.

> The proper way to do it, as you've seen some of these pictures, is basically to spider your line out, and that seemed to me that's how they tied up their two vessels. They were—I didn't see any problems with those vessels as far as I could see.

* * *

> [The vessels] seemed to be secured. There was no verbal agreement of any sort. There was nothing in writing. It was just they tied them up. We looked at them, everything. It just seemed to be secured. They did a proper job as far as we could see. We didn't see any cause to be alarmed by any means.

Ocello Dep. [ECF 133-12] at 3, 5.

CBM, on the other hand, disputes whether the vessels were adequately secured prior to the storm. Herman van der Heide, one of CBM's experts, concluded that Reef should not have chosen to shelter its two vessels at the Marina in the first instance. van der Heide Dep. [ECF 195-1] at 171. In his view, given the size of the vessels, it would have been more prudent for Reef to either haul them out of the water or secure them in the Mangrove Lagoon. *Id.* at 136-38. Van der Heide further concluded that Reef failed to (1) position the vessels properly between the two slips at the Marina so that they had room to move around without coming into contact with the dock or pier, *id.* at 140, 142; (2) use appropriate line lengths to center the vessels between the two slips and ensure that the lines were uniform in their strength and elasticity, *id.* at 145-47; (3) use all available methods—cleats, pilings, and anchors—to secure the vessels and triple or quadruple the docklines, *id.* at 147, 149; (4) examine the assigned berth before the hurricane and secure separate slips for each vessel to reduce the stress on any shared piers, *id.* at 166-67; (5) render the vessels as aerodynamically clean as possible by removing the vessels' awnings and awning support frames prior to the storm to reduce wind pressure on the cleats, anchors, and finger piers, *id.* at 168-69;

*Crown Bay Marina, L.P. v. Reef Transportation, LLC, et al.*
Civil No. 2018-73
Page 11

and (6) secure the vessels' fenders so that they would not be lifted by storm winds, *id.* at 143, 208, 222.

Joseph Bridges, another CBM expert, echoed van der Heide's conclusion that the two Reef vessels should not have been tied up the way they were: "My conclusions were that they shouldn't have berthed with the requirement of sharing a finger pier . . . I would have gone into the next finger pier so that you're not having two vessels share cleats and securing to cleats and dolphins in your berthing." Bridges Dep. [167-1] at 106-07. Specifically, Bridges recommended the following:

> I would have gone into separate berths, and I would have gone in just like I have been talking about at the beginning of this depo, I would have dropped anchors and put anchors out, I would have backed in then, in the middle of that berth and that way I have two finger piers and I have all the cleats on the main dock structure and the dolphins to tie up to, and I would have maximum holding power and I'm away from any kind of structure.

*Id.* at 107. According to Bridges, Reef failed to consider the stress the storm would put on the shared pier:

> Because when a storm rolls through it's not a dynamic situation. Even if wind is predominantly blowing from a certain direction, both vessels are not reacting at the same time exactly the same. So they're not, like, in parallel going back and forth like this.
>
> So they're moving against each other, you know, as the storm surge comes in, as the wind gusts and blows. So that finger pier that they're sharing, there's going to be moments in time when both vessels are pulling opposite directions so they're putting, you know, additional stress on the cleats and dolphins and everything else.
>
> So to me, that was a huge mistake[.]

*Id.* at 108.

*Crown Bay Marina, L.P. v. Reef Transportation, LLC, et al.*
Civil No. 2018-73
Page 12

That the parties differ so widely in their assessment of the methods Reef used to secure

their vessels demonstrates the existence of a genuine issue of material fact as to Reef's alleged

negligence.

       b.    <u>Whether Reef's Vessels Damaged the C Dock During Hurricane Irma</u>

In addition to denying negligence in its preparatory efforts, Reef also avers that the damage

to the C Dock was not caused by its vessels during Hurricane Irma.  According to Reef, the dock

and its structures were in disrepair prior to the storm.  Gregorio Hernandez, a civil engineer Reef

retained,[6] first explained the basic characteristics of the Marina's docks and finger piers:

> The structures are supported on concrete piles and steel pipe
> piles filled with concrete, which are driven into the bottom of the
> sea.  The steel pipes have to be protected against corrosion, specially
> in the top portion, since they are subjected to the combined action
> of the water and the air.
>
>     On top of the piles there are concrete pile caps.  It is
> important that the piles penetrate from 4 to 6 inches into the pilecaps
> in order to be able to transfer horizontal loads and reactions.  If the
> piles rust, they would expand and crack the concrete.  Consequently,
> portions of concrete may fall down and the connection pile/pilecap
> will fail.  To prevent this it is important to use dense concrete for the
> pilecap, provide wide concrete cover around the piles and use
> adequate reinforcing bars in the pilecap.  Another important detail
> is to use reinforcing bars anchored in the concrete filling the pile and
> extending up to the top of the pilecap.  These bars will transfer any
> uplift loads from the pilecap to the piles.

[ECF 133-15] at 4.  Based on photographs taken prior to Hurricane Irma and the "2017 Summer

Maintenance Work List" prepared by CBM personnel, Hernandez concluded that many "pile/pile

cap connections [at the C Dock] had failed structurally before the passing of Irma," and that CBM

was aware of the problem.  *Id.*  Significantly, however, Hernandez qualified his conclusions by

---

    [6] In a separate document, Hernandez declares under oath that "[i]f called to testify in this matter, [he] would testify consistently with the opinions and statements contained in [his] report."  Hernandez Decl. [ECF 133-17] ¶ 2.

noting that he was unable to review the Marina's permitted construction drawings and that such

documentation was "needed to support any opinions about the damage which Hurricane Irma

caused to the marina facilities." *Id.* at 3.

Hernandez also reviewed the reports CBM's experts prepared.  Regarding structural

engineer Paul Ferreras' conclusions, Hernandez stated:

> In summary, it is our opinion that the vessels Morning Star and
> Evening Star did not cause the damage observed at C Dock and at
> the finger piers.  The true cause was the weakening of the pile
> connection to the pile cap due to the rusting of the piles' steel pipes
> and then impacted by the powerful storm surge.

[ECF 133-15] at 8.

Next, after reviewing van der Heide's report, Hernandez concluded that van der Heide's

many recommendations about how the vessels should have been tied up were mostly irrelevant

because there was no evidence that the vessels came into contact with the docks or finger piers,

and therefore did not damage the Marina structures.  *Id.* at 8-10.

Lastly, regarding the Bridges report, Hernandez noted that Bridges failed to review CBM's

2017 summer work list, a document Hernandez described as having "significant information

related to the conditions at Crown Bay Marina."  *Id.* at 10.  Hernandez then stated:

> But even without this document an experienced investigator as
> Joseph R. Bridges should know that the steel pipes of the piles rust
> with the water and air and that rust cracks the concrete of the pile
> caps which may fall down in pieces practically destroying those pile
> caps.  However, in the report, all damage to the Marina is assigned
> only to the actions of the vessels in Irma.

*Id.*

Thomas  Danti,  another  of  Reef's  experts,[7]  corroborated  many  of  Hernandez's

---

[7] In a separate document, Danti declares under oath that "[i]f called to testify in this matter, [he] would testify

*Crown Bay Marina, L.P. v. Reef Transportation, LLC, et al.*
Civil No. 2018-73
Page 14

conclusions.[8]  However, unlike Hernandez, who concluded that the C Dock was damaged because

its structures were in disrepair and therefore unable to withstand the storm surge from Hurricane

Irma, Danti concluded that "the majority of damage done to C docks was done by 'Caribena' a 95

ton, 100 foot steel ferry."  [ECF 133-16] at 10. In addition, Danti found that "when there is no

presented evidence that [Reef's] vessels ever struck the docks, piers, or pilings, it is impossible to

fathom how these vessels caused any meaningful damage to CBM's facilities."  *Id.* at 7.

Despite the assessment of Reef's experts, CBM maintains that genuine issues of material

fact exist as to the cause of damage to the C Dock during Hurricane Irma.  CBM expert Ferreras

attributed the damage to the movement of Reef's vessels during the storm:

> The stand along timber pilings connected to the Morning
> Star and Evening Star vessels had been damaged by only these two
> vessels. . . .  Although the impact caused by the Caribena Ferry and
> forces generated by that impact was considerable, and severed finger
> piers on the opposite side of C Dock from where the Morning Star
> and the Evening Star were tied off, those forces would not likely
> have transferred across C Dock to cause the damage observed at
> finger pier C8, C10, C12, C14, and certainly not the timber pilings
> damaged by Morning Star and the Evening Star.

Ferreras Dep. [ECF 210-1] at 195-96.  According to Ferreras, the damage occurred as a result of

the lateral forces exerted by both vessels:

> What you're looking at is an example of a leverage action.
> This piling goes down—and I don't know the depth.  Let's say it
> goes down 12, 15 feet in depth, inches into the sea bay.  From there
> it goes down another number of feet where it's actually embedded.

---

consistently with the opinions and statements contained in [his] report."  Danti Decl. [ECF 133-18] ¶ 2.

[8]  For example, Danti found that (1) "Morning Star [("MS")] and Evening Star [("ES")] were reasonably
secured in preparation for Hurricane Irma using good seamanship under the circumstances of this case;" (2) "the slips
where the MS and ES were secured during Irma should have had cleats, docks and pilings to carry the weight of both
vessels;" (3) "the MS and ES were properly positioned in the slips to try and prevent damage;" (4) "the use of an
anchor in this situation would have done little or nothing to prevent the MS or ES from coming into contact with the
dock;" (5) "the mooring lines used to secure MS and ES were more than reasonable for vessels weighing about 12,000
lbs.;" and (6) "the fenders in place were sufficient to protect both vessels and the dock."  [ECF 133-16] at 7-10.

*Crown Bay Marina, L.P. v. Reef Transportation, LLC, et al.*
Civil No. 2018-73
Page 15

So it's a fairly long—a long lever.

Now, the two pilings, to get strength on the pilings, they must be spaced very far apart to get real strength out of it. These pilings are side by side. So when one piling is pushed left, one pile is pushed violently down in compression, one is pulled up in tension, and because they're very close, both forces are magnified.

And what I'm looking at there is a failure at the head of the pile cap due to lateral forces. The force is pushing laterally, or what I call north-south, causing a blowout on this piling.

*Id.* at 209-10.

CBM expert Bridges similarly concluded that the damage was caused by lateral forces:

Okay. So when you're in a storm and the surge is coming in and the wind, its not a static environment. It's a very dynamic environment. You have got different waves at different times.

And so the vessels you know, they're not all going one direction all the time and another direction all the time. They're moving in and out, and it's not static. It's dynamic.

So as they push and tug and pull and move around due to the pressures of the storm surge and wind and waves and other factors, they're exerting different pressures on the dock. It's not consistent.

\* \* \*

. . . I'm saying because the [Reef] vessels are moving differently than each other—they could be in unison, but most likely not—so it's very possible that, you know, because they're on the same finger pier, one is on the starboard side, one is on the port side, that they're pulling differently.

Sometimes they're pulling against each other, opposite—against the dock in different directions, is what I'm trying to say. It's a dynamic environment, not a static environment.

Bridges Dep. [ECF 167-1] at 145-46.

Finally, two CBM employees stated that the damage they observed to the C Dock did not exist prior to Hurricane Irma. CBM Head of Maintenance Felix Dubois offered that when he

returned to CBM several days after Hurricane Irma, he observed damages to the C Dock and finger

piers C10/C12 that he had not observed during his preparations for the storm.  Dubois Aff. [ECF

172-1] ¶ 12.  In addition, then-Assistant Director of Operations at CBM Liza Lord averred that

prior to Hurricane Irma, she "did not observe or see any broken concrete piling caps, severed

concrete pilings, cracked con[c]rete decks, or missing concrete [triangles] on C Dock; nor did [she]

observe the finger pier damages at . . . C10/C12."  Lord Aff. [ECF 181-1] at 7.

That the parties also differ in their assessment of causation demonstrates yet another

genuine issue of material fact precluding summary judgment.

### 3.    Whether Reef Breached the CBM Agreements

In its complaint, CBM alleges the following:

> 8.    On or about September 5, 2017, CBM and Defendant entered into that certain License Agreement For Dockage and 2017 Hurricane Evacuation Protocol ("Dockage Agreements").  *See* Dockage Agreements attached hereto as **Exhibit A**.

> 9.    Pursuant to Section 10 of the License Agreement For Dockage, "[t]he owner shall be liable for all damages to the Boat Slip and other facilities owned by [CBM] and other boats or vessels or person on or about [CBM's] premises caused by the Vessel, Owner's employees, family, agents, invitees or guests . . .", including but not limited to storm/hurricane damages and losses.

Ver. Compl. [ECF 1] ¶¶ 8, 9.  There are no other references to the CBM Agreements in the

complaint, and no allegations about any obligation to provide insurance covering CBM.  Further,

at no point in its complaint does CBM allege that Reef actually breached any of the CBM

Agreements.  Reef, however, concedes that CBM has pled a claim for breach of contract based on

a contractual obligation to indemnify.  *See* [ECF 224] at 4.  Thus, as with the negligence claim,

the disputed issue of causation precludes summary judgment for CBM on the failure to indemnify claim.

Further, a party's "initial failure to satisfy the [pleading] burden in no way obligates the district court to allow [that party] an opportunity to offer matters outside the pleadings. Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings." *Fleming v. Lind-Waldock & Co.*, 922 F.2d 20, 24 (1st Cir. 1990); *accord Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006). Because the complaint is devoid of allegations relating to a failure to insure, summary judgment for CBM on that issue is not appropriate.

## IV.   CONCLUSION

In sum, summary judgment is inappropriate in this case. There are genuine issues of material fact as to, *inter alia*, whether Reef was negligent in securing its vessels to the C Dock and as to whether Reef's vessels caused damage to the Marina during Hurricane Irma. Moreover, for the latter reason, summary judgment on the contract claim is also not warranted. So long as there remain genuine issues of fact regarding what caused the damage to the Marina, judgment as a matter of law will not issue. For the reasons discussed above, and the premises considered, the following is ORDERED:

(1) Reef Transportation, LLC's motion for summary judgment [ECF 131] is DENIED.

(2) Crown Bay Marina, LP's cross motion for summary judgment [ECF 182] is DENIED.

(3) Reef Transportation, LLC's motion to strike [ECF 185] is MOOT.

**Dated**: October 16, 2020          S_____
                                                     **RUTH MILLER**
                                                     United States Magistrate Judge