IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

| | | |
|---|---|---|
| CROWN BAY MARINA, L.P., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil No. 2018-73 |
| vs. | ) | |
| | ) | |
| REEF TRANSPORTATION, LLC, *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## **<u>MEMORANDUM OPINION</u>**

Hurricane Irma, a Category 5 storm, passed over St. Thomas in the U.S. Virgin Islands on September 6, 2017.  Two vessels belonging to defendant Reef Transportation, LLC ("Reef") were secured in plaintiff Crown Bay Marina, L.P.'s ("CBM") boat docking facility during the storm.  In this admiralty action, CBM seeks to recover from Reef for damage it claims the vessels caused to the Crown Bay Marina ("the Marina").[1]  A bench trial was held on October 22, 26-30, 2020. Following the trial, the parties submitted proposed findings of fact and conclusions of law to the Court.  [ECFs 312, 313].  The Court, having fully considered the testimonial, video, photographic and documentary evidence presented and admitted at trial, the arguments of counsel and the applicable law, makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

---

[1] This case was consolidated for purposes of trial with *Crown Bay Marina, L.P. v. Subbase Drydock, Inc., et al.*, Civil Action 2018-68.  Unless otherwise indicated, the docket numbers referenced in this opinion refer to documents filed in this case, Civil Action 2018-73.

*Crown Bay Marina, L.P. v. Reef Transportation LLC, et al.,*
Civil No. 2018-73
Page 2

# I.     FINDINGS OF FACT

## A.     <u>The Parties</u>

### <u>CBM</u>

1.     CBM is a Delaware Limited Partnership with its principal place of business in Kirkland, Washington.  Joint  Final Pretrial Order, Sec. IV., Admissions and Stipulations ("JFPTO") [ECF 247] at 41.

2.     CBM owns the Marina, which is located on St. Thomas in the U.S. Virgin Islands.  Oct. 27, 2020 Trial Tr. [ECF 310-2] at 170 (Ohno).[2]

3.     Kosei Ohno is the President of St. Thomas Marina Corporation, which is the general partner of CBM.  Oct. 27, 2020 Trial Tr. [ECF 310-2] at 168 (Ohno).

4.     Marina Management Services ("MMS") managed the Marina from the time CBM took ownership of the facility in 1998 until shortly after Hurricanes Irma and Maria struck in September 2017.  JFPTO [ECF 247] at 38; Oct. 27, 2020 Trial Tr. [ECF 310-2] at 170 (Ohno).

5.     Since 1988, Dennis Kissman has been the President of MMS; he was also a limited partner in CBM.  Dec. 18, 2019 Dep. Tr. [ECF 208-1] at 7, 142 (Kissman).

6.     At the time of Hurricane Irma, Gerry Ocello was the Marina dockmaster.  Jan. 8, 2020 Dep. Tr. [ECF 207-1] at 8-9 (Ocello); Dec. 18, 2019 Dep. Tr. [ECF 208-1] at 101-02 (Kissman).

### <u>Reef</u>

7.     Reef is a limited liability corporation with its principal place of business on St. Thomas, United States Virgin Islands.  JFPTO [ECF 247] at 42.

8.     Reef is owned by Scott McKellar and Jim Trilling.[3]  Oct. 29, 2020 Trial Tr. [ECF 310-4] at 20 (Mathews).

9.     During the days leading up to Hurricane Irma, Scott McKellar was in Washington state; Trilling was on St. Thomas.  Oct. 29, 2020 Trial Tr. [ECF 310-4] at 22 (Mathews).

---

[2]  Exhibits referenced herein are to those admitted into evidence during the trial proceedings.  Trial and designated deposition testimony are referred to by date, docket number, page number of docket entry, and witness in the following format: Oct. 27, 2020 Trial Tr. [ECF 310-2] at 190 (Ohno).

[3]  Trilling earned a merchant mariner's license in 1980, which authorized him to operate any vessel of any size anywhere at any time.  Trilling also has a 100-gross ton auxiliary power with auxiliary sail license with a towing endorsement, seaman endorsement, steward endorsement and wiper endorsement.  The latter license has been renewed eight times.  Oct. 30, 2020 Trial Tr. [ECF 310-5] at 49 (Trilling).

10.     Reef owns two vessels—the M/V Morning Star ("Morning Star") and the M/V Evening Star ("Evening Star").  JFPTO [ECF 247] at 42; Oct. 29, 2020 Trial Tr. [ECF 310-4] at 8-10 (Mathews).

11.     The Morning Star is a green-hulled vessel and the Evening Star is a red-hulled vessel; otherwise, the vessels are the same.  The vessels are 27 feet long, each has a vinyl awning that is lashed to the top and sides of an aluminum frame, and each is equipped with two anchors.  Oct. 29, 2020 Trial Tr. [ECF 310-4] at 9, 56-57, 93 (Mathews).

12.     Prior to Hurricane Irma, Reef's business was shuttling people to and from Marriott's Frenchman's Cove and Frenchman's Reef to the waterfront.  Oct. 30, 2020 Trial Tr. [ECF 310-5] at 40 (Trilling).

**B.      <u>The Layout of the Marina</u>**[4]

13.     The Marina consists of the following docks:  T1-Dock, T2-Dock, A-Dock, B-Dock, C-Dock, D-Dock, E-Dock, and a fuel dock.

14.     The T1, T2, A, and B docks are primarily concrete walls or "bulkheads," while the C-Dock, also made of concrete, consists of a pier extending out perpendicularly from the landside of the Marina that is capped by another pier, known as the "T of C."

15.     Wooden crossbeams or "whalers" are affixed to the side of the bulkheads to provide a buffer between the bulkhead and the vessels that tie up alongside the bulkhead.

16.     The A, B, and C docks have slips or spaces for vessels to tie up.

17.     Narrow docks called "finger piers" separate certain slips.  These finger piers are identified by the slips on either side; thus, the finger pier between slip C9 and C11 is identified as the C9/C11 finger pier.

18.     The C-Dock consists of a dock for dinghies and 28 slips, numbered C4-C32.  Odd-numbered slips are on the southwest side of the dock and even-numbered slips are on the northeast side.

19.     The C-Dock and its finger piers are constructed on pairs of concrete pilings anchored to the sea floor.  Atop each pair of pilings is a concrete "piling cap."  Concrete decking bridges the gaps between the piling caps.

20.     Just off the end of most finger piers is a single fender piling, or a group of fender pilings, known as a "dolphin."  They stand vertically in the water and are not attached to the finger piers.  These can be used to assist with mooring in the slips.

---

[4]  *See* Trial Ex. 54.

21.    In certain locations, halfway between the fender pilings at the end of each set of finger piers is another piling or set of pilings that defines the two slips between the finger piers.

## C.    The Condition of the Marina Prior to Hurricane Irma

22.    In 2014, Clyde Tapp,[5] a Marina employee, took underwater and water level photographs of various structures at the Marina.  Trial Exs. 402, 439; Oct. 30 Trial Tr. [ECF 310-5] at 15-16 (Tapp).  These photographs depict areas of the marina, including the C-Dock and its pilings and piling caps, containing cracked and deteriorated concrete and rusted rebar.

23.    From the time Tapp took the photographs up to the time of Hurricane Irma, CBM did no structural piling work and little to address the conditions shown in the photographs, other than filling small cracks or other minor repairs.  Oct. 30 Trial Tr. [ECF 310-5] at 26-27 (Tapp); Oct. 26 Trial Tr. [ECF 310-1] at 208-09, 214 (Knopf).

24.    In October 2015, CBM contacted Mark Knopf,[6] a marine contractor, about replacing the fender pilings around the C-Dock.  Oct. 26, 2020 Trial Tr. [ECF 310-1] at 224 (Knopf).

25.    On August 17, 2016, Knopf sent CBM an estimate to replace the wooden fender piles on both sides of the C-Dock.  Trial Ex. 405; Oct. 26, 2020 Trial Tr. [ECF 310-1] at 225-26 (Knopf).

26.    On August 25, 2016, Kissman emailed Knopf to let him know that CBM was going to hold off making any repairs to the Marina until late Spring or early Summer of 2017.  Trial Ex. 407; Oct. 26, 2020 Trial Tr. [ECF 310-1] at 228-29 (Knopf).

27.    On May 20, 2017, Knopf emailed Kissman alternative options and corresponding estimates for replacing the three-pile dolphins at the C-Dock and for other potential repairs.  Trial Ex. 409; Oct. 26, 2020 Trial Tr. [ECF 310-1] at 229-30 (Knopf).

28.    On August 9, 2017, Kissman emailed Knopf to let him know that all preparations Knopf was making for repairs to the Marina were to be put on hold per Ohno.  Trial Ex. 411; Oct. 26, 2020 Trial Tr. [ECF 310-1] at 231-32 (Knopf).

---

[5]  Tapp first worked at the Marina from 2010 to 2012 as a member of its maintenance team.  Oct. 30, 2020 Trial Tr. [ECF 310-5] at 10 (Tapp).  He returned to the Marina as its operations manager from 2014 to 2016.  *Id.* (Tapp).  As operations manager, Tapp was responsible for the day to day operations of the Marina as well as maintenance.  *Id.* at 13 (Tapp).  Tapp was raised and still lives on Water Island.  *Id.* at 9 (Tapp).  He has been at or near the Marina most days of his life.  *Id.* at 13 (Tapp).

[6]  At the time, Knopf was the owner of Pro Mar Services, Inc. ("Pro Mar").  Oct. 26, 2020 Trial Tr. [ECF 310-1] at 123 (Knopf).  Knopf, a licensed general contractor specializing in marine contracting, founded Pro Mar in 1998 in the Virgin Islands.  *Id.* (Knopf).  At trial, Knopf testified based on his knowledge of certain facts and based upon his expertise in the area of marine construction and repair.  *Id.* at 171.

29.     On September 5, 2017, the day before Hurricane Irma hit St. Thomas, Herman van der Heide took ground level and aerial photographs of the Marina.

**D.     Preparation for Hurricane Irma**

30.     Pursuant to the vessels' Certification of Inspection, as protected waters vessels, the Reef vessels were not permitted to be more than 1,000 yards from the shore.  Oct. 29, 2020 Trial Tr. [ECF 310-4] at 14-15 (Mathews).

31.     On August 30, 2017, at 11:00 a.m. AST, the National Hurricane Center ("NHC") announced that a low-pressure area in the Atlantic Ocean had become Tropical Storm Irma. JFPTO [ECF 247] at 39.

32.     On August 31, 2017, at 11:00 a.m. AST, the NHC announced that Tropical Storm Irma had become Hurricane Irma.  Between August 31, 2017 and September 4, 2017, Hurricane Irma fluctuated between being a Category 2 and a Category 3 storm.  JFPTO [ECF 247] at 38-40.

33.     Reef began planning for Hurricane Irma in the middle part of the week prior to the storm. Oct. 29, 2020 Trial Tr. [ECF 310-4] at 17 (Mathews).

34.     On September 4, 2017, at 11:00 a.m. AST, the NHC issued a hurricane watch for the U.S. Virgin Islands.[7]  JFPTO [ECF 247] at 41.

35.     Twenty-four hours before Hurricane Irma struck St. Thomas, Kissman informed Ohno that Marina policy had changed and that vessels would be allowed to shelter at the Marina during the upcoming storm.  Oct. 28, 2020 Trial Tr. [ECF 310-3] at 28 (Ohno).

36.     On September 4, 2017, Reef first planned to take the vessels to the Mangrove Lagoon. Trial Ex. 105; Oct. 29, 2020 Trial Tr. [ECF 310-4] at 83-84 (Mathews).  Later, Trilling, in consultation with Captain Chris Mathews,[8] decided to move the vessels to the Marina.  Oct. 30, 2020 Trial Tr. [ECF 310-5] at 43 (Trilling).  Reef contacted the Marina to reserve space for both vessels beginning on September 5, 2017.  JFPTO [ECF 247] at 42.

37.     On September 4, 2017, at 11:00 p.m. AST, the NHC issued hurricane warnings for Puerto Rico and the Virgin Islands.  JFPTO [ECF 247] at 41.

---

[7] A hurricane watch, which means that hurricane conditions are possible within the watch area, is typically issued 48 hours before the first anticipated tropical storm force winds.  JFPTO [ECF 247] at 41.

[8] Mathews is a U.S. Coast Guard licensed captain with a 100-ton master's certificate and with sail and commercial assist towing endorsements.  Oct. 29, 2020 Trial Tr. [ECF 310-4] at 11 (Mathews).  At the time of Hurricane Irma, Mathews had worked for Reef as a ferry driver and senior captain for between seven and nine years. *Id.* at 8 (Mathews).  As a ferry driver, Mathews took passengers from the Cove Dock and Marriot Dock to downtown; as a senior captain, he was both a ferry driver and created the drivers' schedules, and he was responsible for the maintenance of both vessels.  *Id.* at 8-9 (Mathews).

38.　　On September 5, 2017, at 7:45 a.m. AST, the NHC announced that Hurricane Irma was a Category 5 storm.  JFPTO [ECF 247] at 41.

39.　　On September 5, 2017, Mathews picked up Reef Captain Dave MacVean and Reef Captain Robert Ritter from Marriott Frenchman's Cove in Mathews' personal dinghy and took them to the vessels.  Oct. 29, 2020 Trial Tr. [ECF 310-4] at 23, 25, 28 (Mathews).

40.　　MacVean and Ritter then drove the vessels to the Marina; Mathews attached his dinghy to one of the vessels.  Oct. 29, 2020 Trial Tr. [ECF 310-4] at 23 (Mathews).

41.　　When they arrived at the Marina, Reef contacted the Marina office.  Oct. 29, 2020 Trial Tr. [ECF 310-4] at 23 (Mathews).

42.　　After entering the Marina, the Reef captains took the vessels to the northeast side of the C-Dock, as instructed by a Marina employee.  Oct. 29, 2020 Trial Tr. [ECF 310-4] at 25-26 (Mathews).

43.　　The Reef captains placed the vessels in slips C10 (Morning Star) and C12 (Evening Star), with their bows facing the dock; they tied both vessels to the C10/C12 finger pier.  Trial Ex. 17; Oct. 29, 2020 Trial Tr. [ECF 310-4] at 31 (Mathews); Trial Ex. 111.

44.　　The Reef captains tied the vessels off with three-strand nylon line of either 5/8-inch or 1/2-inch diameter; they used lines of varying lengths on each vessel.  Oct. 29, 2020 Trial Tr. [ECF 310-4] at 32, 62 (Mathews).

45.　　The Reef captains placed loose items inside the pilot houses, closed and tied the life jacket boxes, and then closed and tied the pilot houses.  Oct. 29, 2020 Trial Tr. [ECF 310-4] at 29 (Mathews).

46.　　The Reef captains hung the vessels' fenders on lines from the top of the awning frame on each vessel and then tied some of the fenders back to the vessel rail from a line emerging below each fender.  Oct. 29, 2020 Trial Tr. [ECF 310-4] at 32 (Mathews).

47.　　The Reef captains tied off the Morning Star in slip C12 by running lines as follows:  from the vessel forward to the mid-portion of the C-Dock; from the vessel to the mid-portion of the C10/C12 finger pier; from the rear of the vessel to the edge of the C10/C12 finger pier; from the vessel to the dolphin pile behind it; and from the vessel across to the C14/C16 finger pier.  Trial Exs. 17, 113.

48.　　The Reef captains tied off the Evening Star in slip C10 by running lines as follows:  from the forward portion of the vessel to the main C-Dock; from the vessel forward to the base of slip C8; from the vessel to the mid-portion of the C6/C8 finger pier; from the vessel diagonally back to the dolphin pile behind it; and from the vessel to the mid-portion of the C10/C12 finger pier.  Trial Exs. 17, 113.

49.     The Reef captains did not deploy anchors.  JFPTO [ECF 247] at 42.

50.     Ocello looked over the Reef vessels after they were tied up and concluded that the Reef captains "did a proper job."  Jan. 8, 2020 Dep. Tr. [ECF 207-1] at 75, 79 (Ocello).

51.     The Reef captains arrived at the Marina at 10:00 a.m. on September 5, 2017 and left approximately three hours later.  Oct. 29, 2020 Trial Tr. [ECF 310-4] at 33 (Mathews).

52.     After tying off the vessels, Mathews went to the Marina office to sign paperwork.  Oct. 29, 2020 Trial Tr. [ECF 310-4] at 33-34 (Mathews).

53.     Mathews executed three CBM documents per vessel on September 5, 2017.  JFPTO [ECF 247] at 42.

54.     The first document, the License Agreement for Dockage ("the License Agreement"), is a two-page document that details the conditions under which dock space at the Marina may be occupied.  Trial Exs. 101A, 102A; Oct. 29, 2020 Trial Tr. [ECF 310-4] at 66 (Mathews).

55.     The License Agreement  provides:

> 4.     Owner warrants and represents that at all times during the term of this Agreement, the Vessel shall be maintained in a safe and seaworthy condition by Owner and shall be operated in a careful and safe manner so as not to cause damage to Marina's facilities or to any other property, vessel or persons.  . . .

> * * *

> 7.     Owner, at his sole cost and expense, agrees to procure and maintain in force during the entire term of this Agreement Indemnity Insurance covering the Vessel and protecting Owner and Marina against all claims, demands, suits and judgments in policy amounts of not less than $1,000,000 for claims arising within the coverage of said policies.  Owner's insurance policy shall specifically cover the risks undertaken in Paragraph 10 of this Agreement and the Owner or Owner's Agent agrees to name Marina as an additional insured.  . . .

> 8.     Storms and Other Emergencies:  The Owner shall make suitable arrangements for safe, sheltered anchorage during tropical storms, hurricanes or other inclement weather and Owner hereby warrants such arrangements have or will be made.  . . .

> * * *

> 10.     Owner shall be liable for all damages to the Boat Slip
> and other facilities owned by the Marina and other boats or vessels
> or persons on or about Marina's premises caused by the Vessel,
> Owner's employees, family, agents, invitees or guests (collectively
> referred to as the "Vessel's Parties"). . . .

Trial Ex. 101A at 1-2; Trial Ex. 102A at 1-2.

56.   The second document, the Dayworker Agreement of Waiver of Liability and Assumption
of Risk ("the Dayworker Agreement"), is a one-page document. *See, e.g.*, Trial Ex. 102B.

57.   The third document, the Crown Bay Marina 2017 Hurricane Evacuation Protocol ("the
Evacuation Protocol"), consists of one page and applied during the 2017 hurricane season.
Trial Exs. 101C, 102C;[9] Oct. 29, 2020 Trial Tr. [ECF 310-4] at 65 (Mathews). The
Evacuation Protocol reproduces the first sentence of paragraph 10 of the License
Agreement, and contains the following additional language, printed in bold capital letters,
at the bottom of the first page: "**CROWN BAY MARINA SHOULD NOT BE
CONSIDERED A SAFE HARBOR DURING TROPICAL WEATHER
CONDITIONS**." Trial Exs. 101C, 102C.

58.   The Marina charged Reef $150 per vessel per slip.[10] Oct. 27, 2020 [ECF 310-2] at 187-88
(Ohno).

59.   At 5:30 p.m. on September 5, 2017, Trilling went to the Marina to inspect the vessels. Oct.
30, 2020 Trial Tr. [ECF 310-5] at 47 (Trilling).

**E.   Impact of Hurricane Irma**

60.   On September 6, 2017, Hurricane Irma hit St. Thomas. JFPTO [ECF 247] at 40.

61.   The following vessels were tied up at the Marina when Hurricane Irma struck: (1) Culebra
II alongside the T2-Dock, with a work vessel tied alongside, (2) a sailboat belonging to
Ocello in slips A1 and A2, (3) the Sea Tow in slip A5, (4) the Caribeña in slip B1, (5) the
M/V LSJ in slip B3, (6) the Run Aweigh in slip B5, (7) the Evening Star in slip C10, (8)
the Morning Star in slip C12, and (9) the M/V Sky Fall in slip C26.[11]

---

[9]   Neither vessel's name is on the Hurricane Protocol documents.

[10]   During hurricane season, the Marina charges vessel owners a flat fee for dockage. Oct. 27, 2020 Trial Tr.
[ECF 310-2] at 190 (Ohno). During non-hurricane season, the Marina charges vessel owners a variable rate based on
the linear footage of the vessel. *Id.* (Ohno).

[11]   CBM allowed 16 vessels to moor in the Marina for Hurricane Irma. Trial Exs. 339, 432.

62.     Both the Morning Star and Evening Star suffered some damage.  Oct. 29, 2020 Trial Tr. [ECF 310-4] at 37 (Mathews).

63.     Neither of the vessels' lines parted and neither vessel sank.  JFPTO [ECF 247] at 43; Oct. 29, 2020 Trial Tr. [ECF 310-4] at 124-25 (Danti).[12]

64.     Following Hurricane Irma, the Reef vessels' mooring lines appeared looser than they were before the storm.  Oct. 30, 2020 Trial Tr. [ECF 310-5] at 53 (Trilling).

65.     As for the Morning Star, the awning frame was missing and the awning was floating in the water, the life jacket box was destroyed, stanchions on the starboard side were missing, and the rub rail on the starboard bow was hanging down.  Oct. 29, 2020 Trial Tr. [ECF 310-4] at 37, 41, 58 (Mathews); Oct. 30, 2020 Trial Tr. [ECF 310-5] at 52-53 (Trilling).[13]

66.     Reef contacted Marty Carlson, a surveyor, to assess the damage to the Morning Star for insurance purposes.  Reef filed an insurance claim as to that vessel, which it settled for between $40,000 and $41,000.  Oct. 30, 2020 Trial Tr. [ECF 310-5] at 55-56 (Trilling).

67.     The life jacket box on the Evening Star was severely damaged.  Oct. 29, 2020 Trial Tr. [ECF 310-4] at 41 (Mathews).

## F.     Events Following Hurricane Irma

68.     Trilling returned to the Marina on the afternoons of September 10 and 12, 2017.  Oct. 30, 2020 Trial Tr. [ECF 310-5] at 52 (Trilling).

69.     Mathews, MacVean, and Ritter returned to the Marina one week after Hurricane Irma.  Oct. 29, 2020 Trial Tr. [ECF 310-4] at 36, 40 (Mathews).

70.     The Reef captains untied the vessels and took them back to Marriott Frenchman's Cove.  Oct. 29, 2020 Trial Tr. [ECF 310-4] at 40 (Mathews); Oct. 30, 2020 Trial Tr. [ECF 310-5] at 54-55 (Trilling).

71.     Hurricane Maria hit St. Thomas on September 16, 2017.

---

[12]   Captain Thomas Danti is Dean of Instruction and instructor at the Chapman School of Seamanship.  Oct. 29, 2020 Trial Tr. [ECF 310-4] at 103 (Danti).  He is recognized by the Court as an expert in marine safety and seamanship.  *Id.* at 110 (Danti).  He has secured or helped secure "hundreds" of vessels for named storms or hurricanes, including for major storms and hurricanes such as Frances, Jeanne, Wilma, Irma and Dorian.  *Id.* 107-08 (Danti).

[13]   Reef obtained a repair estimate from Subbase Drydock for the Morning Star, in which it recommended that Reef replace the awning, replace the double rubber rails, replace the decal of the vessel's name, replace the teak cap rail, and replace the aluminum frames for the awning.  Trial Ex. 109; Oct. 26, 2020 Trial Tr. [ECF 310-1] at 101-04 (Kral, Jr.).

72.   CBM contacted Knopf shortly after Hurricane Irma to request an estimate for repairs to the Marina.   Oct. 26, 2020 Trial Tr. [ECF 310-1] at 125-26 (Knopf).

73.   The first time Knopf saw the Marina after Hurricanes Irma and Maria was on October 4, 2017, the day he returned to the Territory.   He began to assess the damage and returned to the Marina several days later to continue his assessment.   Oct. 26, 2020 Trial Tr. [ECF 310-1] at 126 (Knopf).

74.   On October 27, 2017, CBM entered into a contract with Knopf to make temporary repairs to the Marina, for a total cost of $408,148.[14]   This included removing concrete (broken piles, pile caps, and deck slabs) from the water at the B-Dock and C-Dock, and fendering on the T-Dock, B-Dock, and D-Dock.   Trial Ex. 82 at 2; Oct. 26, 2020 Trial Tr. [ECF 310-1] at 135 (Knopf); Trial Ex. 81; Oct. 26, 2020 Trial Tr. [ECF 310-1] at 127-29, 137-38 (Knopf).

75.   On February 12, 2018, Knopf provided CBM with a storm-related permanent repairs estimate.   Trial Ex. 80; Oct. 26, 2020 Trial Tr. [ECF 310-1] at 152 (Knopf).

76.   On June 25, 2020, Knopf provided CBM with a revised statement of the repair costs detailed in his February 12, 2018 estimate.[15]   Oct. 26, 2020 Trial Tr. [ECF 310-1] at 159-60 (Knopf).   In his revised statement, Knopf estimated that permanent repairs to the finger piers at C6/C8, C10/C12, and C14/C16 would cost approximately $449,216.   *Id.* at 166, 168-70 (Knopf).

77.   CBM retained Paul Ferreras,[16] a structural engineer, to provide an engineering damage assessment of the Marina following Hurricanes Irma and Maria.   Oct. 22, 2020 Trial Tr. [ECF 310] at 12, 18 (Ferreras).

78.   Starting on November 20, 2017 and on several other occasions into early December 2017, Ferreras and Keith Pomeroy,[17] one of Ferreras' employees, physically inspected the Marina.   At the time Ferreras was conducting his assessment, ProMar had already begun making repairs; there were no vessels at the Marina.   Oct. 22, 2020 Trial Tr. [ECF 310] at

---

[14]   The parties entered into two change orders for this contract, adding an additional $108.654 to the cost for temporary repairs.   Trial Exs. 82, 85.

[15]   At the time Knopf provided the revised estimate, he was the owner of Marine Consultants LLC, a marine construction consulting company.   Trial Ex. 78; Oct. 26, 2020 Trial Tr. [ECF 310-1] at 159-60 (Knopf).

[16]   Ferreras owns and operates Paul Ferreras PE, Inc., a structural engineering firm based on St. Thomas.   Oct. 22, 2020 Trial Tr. [ECF 310] at 12-13 (Ferreras).   The firm employs two structural engineers, a civil engineer, an architect, a draftsman, a concrete technician, and an office manager.   *Id.* at 14 (Ferreras)..

[17]   Pomeroy is a civil engineer with a 100-ton U.S. Coast Guard captain's license.   Oct. 22, 2020 Trial Tr. [ECF 310] at 25-26 (Ferreras).

20-21, 134 (Ferreras).[18]

79.    Ferreras and Pomeroy worked with Fran Woods, an outside consultant, to provide an engineer's estimate of the damage to the Marina. Oct. 22, 2020 Trial Tr. [ECF 310] at 19, 79, 180 (Ferreras). Ferreras estimated that the cost for repair and reconstruction of the Marina structures damaged by the Reef vessels, not including contingency and supervision, was $239,947. *Id.* at 133 (Ferreras). Ferreras' estimate included repairing the finger piers at C6/C8, C10/C12, and C14/C16, which involves demolition, replacing piles, replacing pile caps, and installing a new deck surface. *Id.* (Ferreras).

80.    On December 19, 2017, Ferreras sent Ohno a draft report and photograph logs for his review. On December 24, 2017, Ohno responded to Ferreras, requesting that Ferreras provide him with a breakdown of damages by vessel location. Trial Ex. 429; Oct. 22, 2020 Trial Tr. [ECF 310] at 178-79 (Ferreras).

81.    After receiving Ohno's request, Ferreras revised his draft report and added a cost analysis sheet prepared by Pomeroy and Woods. This revision became Ferreras' January 10, 2018 report. Oct. 22, 2020 Trial Tr. [ECF 310] at 179-80 (Ferreras).

82.    Following the hurricanes, the Virgin Islands Water and Power Authority restored power to the C-Dock sometime in December 2017. Oct. 28, 2020 Trial Tr. [ECF 310-3] at 34 (Ohno).

83.    In March or April of 2018, the Marina made twenty slips that were damaged in Hurricanes Irma and Maria available for use by the public. Oct. 28, 2020 Trial Tr. [ECF 310-3] at 46 (Ohno).

84.    Ohno obtained data from the Marina's accounting software, MMS System, which electronically registers all revenues collected for specific vessels, including electricity and water. Trial Ex. 129; Oct. 27, 2020 Trial Tr. [ECF 310-2] at 181 (Ohno). Based on this data, Ohno estimated lost revenue for slips C8, C10, C12, and C14. Trial Ex. 129; Oct. 27, 2020 Trial Tr. [ECF 310-2] at 183 (Ohno).

## II.    CONCLUSIONS OF LAW

District courts of the United States "have original jurisdiction . . . of [a]ny civil case of . . . maritime jurisdiction." 28 U.S.C. § 1333(1).[19] "The fundamental interest giving rise to maritime

---

[18]  Ferreras and Pomeroy produced a photograph log as part of their evaluation of the damage at the Marina; the photographs were taken between November 20 and December 15, 2017. Trial Ex. 154; Oct. 22, 2020 Trial Tr. [ECF 310] at 89-90 (Ferreras).

[19]  Under 48 U.S.C. § 1612(a), the District Court of the Virgin Islands has the same "jurisdiction of a District Court of the United States."

jurisdiction is the protection of maritime commerce." *Hargus v. Ferocious & Impetuous, LLC*, 840 F.3d 133, 136 (3d Cir. 2016) (quotation marks omitted). In determining whether admiralty jurisdiction exists, the court applies substantive federal admiralty law. *Interested Underwriters at Lloyd's v. Haulover Marine, Inc.*, 866 F. Supp. 235, 236-37 (D.V.I. 1994).

## A.   <u>Maritime Tort Claims</u>

"For a federal court to have admiralty jurisdiction over a tort claim, the tort must (1) occur on navigable waters and (2) bear some relationship to traditional maritime activity." *Andreu v. Palmas del Mar Homeowners Ass'n, Inc.*, 311 F. Supp. 3d 456, 459 (D.P.R. 2018) (citing *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995)). Navigable waters are those which, on their own or in conjunction with others, form "a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water." *Andreu*, 311 F. Supp. 3d at 459-60 (quoting *The Daniel Ball*, 77 U.S. 557, 563 (1870)). Torts bear a relationship to traditional maritime activity if the incident could potentially disrupt maritime commerce and if "the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *Andreu*, 311 F. Supp. 3d at 460-61 (quoting *Grubart*, 513 U.S. at 534).

In this case, CBM's tort claims related to the mooring of the Morning Star and the Evening Star are governed by federal admiralty law. First, the general features of the incident—damage to a marina located on navigable waters allegedly caused by commercial vessels docked at that marina during a hurricane—could potentially disrupt commercial activity. *See Sisson v. Ruby*, 497 U.S. 358, 363 (1990) ("Here, the general features [of the incident]—a fire on a vessel docked at a marina on navigable waters—plainly satisfy the requirement of potential disruption to commercial maritime activity."). Second, the mooring of vessels at a marina situated on navigable waters is

*Crown Bay Marina, L.P. v. Reef Transportation LLC, et al.,*
Civil No. 2018-73
Page 13

substantially related to traditional maritime activity. *See id.* at 367 ("Clearly, the storage and maintenance of a vessel at a marina on navigable waters is substantially related to 'traditional maritime activity' given the broad perspective demanded by the second aspect of the test. Docking a vessel at a marina on a navigable waterway is a common, if not indispensable, maritime activity.").

The elements of a negligence claim under admiralty law are as follows:

> "(1) 'the existence of a duty required by law which obliges the person to conform to a certain standard of conduct'; (2) 'a breach of that duty by engaging in conduct that falls below the applicable standard or norm'; (3) a resulting loss or injury to the plaintiff; and (4) 'a reasonably close causal connection between the offending conduct and the resulting injury.'" [*In re Frescati Shipping Co. v. Citgo Asphalt Ref. Co.,* 718 F.3d 184, 207 (3d Cir. 2013)] (alterations omitted) (quoting 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law*, §§ 5–2, at 252 (5th ed. 2011)).

*Pogan v. M/V Venture Pride*, 2018 WL 1548687, at *2 (D.V.I. Mar. 28, 2018).[20] "Under the general principles of negligence, mariners are expected to exercise human skill and precaution, and a proper display of nautical skill, *i.e.*, reasonable care under the circumstances." *Id.* (quotation marks omitted);[21] *see also* 2 Thomas J. Schoenbaum, *Admiralty & Maritime Law*, § 14-2 (5th ed. 2011) ("The test and standard for a finding of negligence is reasonable care under the circumstances, or whether judged against the standard of good and prudent seamanship, the collision could have been prevented by the exercise of due care.") (quoted in *Pogan, 2*018 WL

---

[20] The elements of maritime negligence are essentially the same as those for common law negligence. *See Norfolk Shipbuilding & Drydock Corp. v. Garris*, 532 U.S. 811, 815 (2001) (explaining "common-law duties of care . . . have been adjusted to fit their maritime context"); *Frescati Shipping Co.*, 718 F.3d at 207 ("Negligence in admiralty law is essentially coextensive with its common law counterpart . . . ."); *Galentine v. Estate of Stekervetz*, 273 F. Supp. 2d 538, 544 (D. Del. 2003) ("Under general federal maritime law, negligence is an actionable wrong.").

[21] "Generally, in admiralty, the duty of care may be derived from 1) duly enacted laws, regulations and rules; 2) custom; or 3) the dictates of reasonableness and prudence." *Galentine*, 273 F. Supp. 2d at 544.

1548687, at *2) (footnotes omitted).  In the context of hurricane preparedness, reasonable care has been interpreted to mean "whether the owner use[d] all reasonable means and took proper action to guard against, prevent or mitigate the dangers posed by the hurricane." *Fischer v. S/Y NERAIDA*, 508 F.3d 586, 594 (11th Cir. 2007) (quotation marks omitted).  "Although what 'reasonable care' requires changes with the circumstances, that standard recognizes the existence in every case of something more that could be done—and perhaps would be legally required under a 'highest degree of caution' standard—but that reasonable care does not demand." *Id.*

Under the *Louisiana* Rule,[22] when a vessel moving as a result of an external force such as a current or wind allides with a stationary object, the moving vessel is presumptively at fault. *Fischer*, 508 F.3d at 593 (citing *The Louisiana*, 70 U.S. 164, 173 (1865)).  Once the rule is applied, it creates a rebuttable presumption of negligence.  *Fischer*, 508 F.3d at 593.  To defeat the presumption, the defendant must demonstrate "[1] that the allision was the fault of the stationary object[;] [2] that the moving vessel acted with reasonable care[;] or [3] that the allision was an unavoidable accident." *Id.*  In all cases, maritime negligence is actionable only if it is a legal cause of the plaintiff's injuries—that is, "the negligence must be a substantial factor in causing the injuries." *Great Lakes Dredge & Dock Co. LLC v. La. State*, 624 F.3d 201, 214 (5th Cir. 2010) (quotation marks omitted); *accord Revak v. Interforest Terminal UMEA AB*, 2009 WL 1410278, at *5 (E.D. Pa. May 14, 2009) (the inquiry considers not only factual causation—whether the "event would have occurred in the absence of an act or omission," but also proximate causation— whether "the damage was a reasonably foreseeable consequence" of the act or omission) (quotation

---

[22] Although the Third Circuit has not expressly adopted the *Louisiana* Rule, it is a well-established principle in admiralty law.  *See Hatt 65, LLC v. Kreitzberg*, 658 F.3d 1243, 1248-49 (11th Cir. 2011); *In re Signal Intern., LLC*, 579 F.3d 478, 490 n.11 (5th Cir.2009); *Hood v. Knappton Corp., Inc.*, 986 F.2d 329, 332 (9th Cir. 1993); *Patapsco Scrap Corp. v. Md. Shipbuilding & Drydock Co.*, 268 F.2d 817, 819 (4th Cir. 1959).

marks omitted).  "Finally, actual economic loss, injury, or damages suffered by the plaintiff must be specifically demonstrated."  *Galentine*, 273 F. Supp. 2d at 544.

## B.  Maritime Contract Claims

Where the court has admiralty jurisdiction over a contract claim, the court must apply federal choice of law rules to determine the applicable law.  *Calhoun v. Yamaha Motor Corp., U.S.A.*, 216 F.3d 338, 343 (3d Cir. 2000); *accord State Trading Corp. of India v. Assuranceforeningen Skuld*, 921 F.2d 409, 414 (2d Cir. 1990) ("A federal court sitting in admiralty must apply federal choice of law rules.").  "[C]ourts apply federal choice-of-law rules by 'ascertaining and valuing points of contact between the transaction and the states or governments whose competing laws are involved.'"  *Travelers Prop. Cas. Co. of Am. v. Ocean Reef Charters LLC*, 324 F. Supp. 3d 366, 383-84 (W.D.N.Y. 2018) (quoting *Lauritzen v. Larsen*, 345 U.S. 571, 582 (1953)).  Those points of contact are "(1) any choice-of-law provision contained in the contract; (2) the place where the contract was negotiated, issued, and signed; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties."  *Advani Enters., Inc. v. Underwriters at Lloyds*, 140 F.3d 157, 162 (2d Cir. 1998).[23]

"[W]hen a maritime contract contains a choice-of-law clause, the law chosen by the parties governs . . . unless (1) that jurisdiction has no substantial relationship to the parties or the transaction or (2) that jurisdiction's law conflicts with the fundamental purposes of maritime law . . . ."  *Farrell Lines Inc. v. Columbus Cello-Poly Corp.*, 32 F. Supp. 2d 118, 127 (S.D.N.Y. 1997) (citations and quotation marks omitted).  In other words, "[t]he fact that a choice-of-laws provision

---

[23]  When a maritime contract does not contain a choice-of-law provision, the court simply skips the first factor.  *Travelers Prop. Cas. Co. of Am.*, 324 F. Supp. 3d at 384.

exists in a contract does not, by itself, remove the contract from the scope of maritime law."
*Williamson v. Recovery Ltd. P'ship*, 542 F.3d 43, 49 (2d Cir. 2008).  Rather, "once a contract has
been deemed a maritime contract, the next step is determining whether a specific state's laws
should be used to *supplement* any area of contract law for which federal common law does not
provide."  *Id.* (emphasis in original).

Here, CBM is suing Reef for breach of the License Agreement and the Evacuation
Protocol.  Ver. Compl. [ECF 1] ¶ 8.  Paragraph 17 of the License Agreement provides that the
agreement "shall be governed by, construed and enforced in accordance with the Laws of the
Territory of the U.S. Virgin Islands and the United States of America."  *See, e.g.*, [ECF 133-8] at
3.  Unlike the License Agreement, the Evacuation Protocol does not contain a choice of law
provision.  Nevertheless, (1) the Evacuation Protocol was issued and signed in the Virgin Islands;
(2) the agreement was performed in the Virgin Islands; (3) the subject matter of the contract—
evacuation protocols for vessels stored at the Marina—is located in the Virgin Islands; and (4)
both CBM and Reef are located in the Virgin Islands, with Reef being incorporated in the Virgin
Islands.  Because "all writings that are part of the same transaction are interpreted together,"
*Sunshine Shopping Ctr., Inc. v. Kmart Corp.*, 85 F. Supp. 2d 537, 541 (D.V.I. 2000) (quotation
marks and citation omitted), both agreements are governed by federal maritime law possibly
supplemented with Virgin Islands law.

"[O]ur interpretation of maritime contracts sounds in federal common law, so we look to
the general common law of contracts."  *Internaves de Mex. s.a. de C.V. v. Andromeda S.S. Corp.*,
898 F.3d 1087, 1093 (11th Cir. 2018).  Under the federal common law, "[t]he elements of a breach
of contract claim are the existence of a contract, material breach, and damages."  *Kol B'Seder, Inc.
v. Certain Underwriters at Lloyd's of London Subscribing to Certificate No. 154766 Under*

*Contract No. B0621MASRSWV15BND*, 766 F. App'x 795, 803 (11th Cir. 2019).   These are

essentially the same elements specified by Virgin Islands law.   *See Benjamin v. Gov't of the V.I.*,

2020 WL 1426691, at *4 (V.I. Super. Mar. 16, 2020) (noting that the elements for a breach of

contract are "(1) the existence of a contract; (2) a contractually created duty; (3) a breach of that

duty; and (4) damages suffered due to that breach.").

**C.**    **Analysis**

   **1.**    **The Negligence Claim**

   CBM contends that Reef was negligent in the manner it moored its vessels in the Marina.

According to CBM, Reef's vessels damaged the Marina by either making contact with some of its

elements, or imparting stress on those elements as a result of their movements during the

hurricane—stress the Marina was not designed to withstand.

   The Court is not persuaded that either of the Reef vessels in fact made contact with the C-

Dock or the C10/C12 finger pier.   If one or both vessels did come into contact with CBM's docks,

however, then under the *Louisiana* Rule, Reef must rebut the presumption of negligence.   Based

on the record before it, the Court concludes that Reef would have satisfied its burden.

   First, notwithstanding CBM's insistence that Reef was required to take every possible

precaution when tying off the vessels,[24] it was only required to take those measures that a mariner

exercising reasonable care in those circumstances would have taken.   According to seamanship

expert Danti, with whom the Court agrees, the latter standard was met:

---

[24]   According to CBM, Reef "failed to use all reasonable means to guard against, prevent and mitigate the
danger posed by the hurricane to the marina's docks, finger piers, pilings and pile caps." [ECF 313] at 27.  Specifically,
CBM contends that Captain Mathews and the other Reef captains were negligent because they failed to (1) secure
each vessel to separate finger piers, (2) deploy anchors, (3) use all available cleats, (4) use all available dolphin piles,
(5) use lines of the same length, type and diameter, (6) remove the awnings, (7) spider the lines, (8) use fenders
properly, (9) use the Mediterranean method of mooring, and (10) use chafing gear.  *Id.* at 30-31.

*Crown Bay Marina, L.P. v. Reef Transportation LLC, et al.,*
Civil No. 2018-73
Page 18

> The display and the layout of the [Reef vessels'] lines as far as I'm concerned were reasonable.  The number of lines and the attachment points were reasonable.  The location of the vessels in their slip were reasonable.  The placement of fenders and what chafing gear they did use was all reasonable, in my opinion.

Oct. 29, 2020 Trial Tr. [ECF 310-4] at 113-14 (Danti).  Danti further testified that Reef's decision not to deploy anchors was reasonable given the Marina's layout.  *Id.* at 121-22.  In addition, despite the testimony from Joseph Bridges, an expert in mooring operations, criticizing the way the vessels were secured,[25] CBM cannot dispute the fact that the vessels survived Hurricane Irma virtually intact—both vessels remained in their respective slips during the storm, neither vessel's lines parted, and neither vessel sank.[26]  The Court finds that Reef exercised reasonable care under the circumstances.

Next, even if the evidence demonstrated that Reef had neglected to take all reasonable means "to guard against, prevent or mitigate the dangers posed by the hurricane," the evidence does not establish that the Reef vessels were the proximate cause of the damages CBM complains of.  That is in part because the evidence regarding the condition of the C-Dock and its ancillary structures immediately preceding Hurricane Irma was inconclusive.

According to engineer Ferreras, the lateral forces exerted by the vessels during Hurricane Irma were much greater than the Marina structures were designed to withstand, thereby damaging the concrete decking, pilings, and piling caps at finger piers C6/C8, C10/C12, and C14/C16.[27]

---

[25] Bridges testified that the Reef captains should have centered the vessels in their respective slips, deployed anchors, used more chafing gear, and removed the awnings.  Oct. 27, 2020 Trial Tr. [310-2] at 61 (Bridges).

[26] *See In re Matter of Complaint of Atlantic Marine Property Holding Co., Inc.*, 570 F.Supp.2d 1369, 1377 (S.D. Al. 2008) ("There is clearly no agreement as to what preparations would have protected [a barge and its cargo, another vessel,] from breaking away, much less what should 'reasonably' have been done to protect [them].  The only clear fact is that the preparations actually made were insufficient since the moorings failed.").

[27] *See, e.g.*, Oct. 22, 2020 Trial Tr. [ECF 310] at 93 (Ferreras) ("That crack was due, the most reasonable

*Crown Bay Marina, L.P. v. Reef Transportation LLC, et al.,*
Civil No. 2018-73
Page 19

However, Ferreras' assessment was based on a comparison of photographs that were taken on September 5, 2017, the day before Hurricane Irma, with photographs taken in late November and early December 2017, which was over two months after Hurricanes Irma and Maria struck, during which latter event the Reef vessels were absent from the Marina.[28]   Further, when shown the photographs of the Marina that Clyde Tapp took in 2014, Ferreras admitted both that his physical inspection of the Marina did not afford him the opportunity to view the condition of certain underdeck or underwater structures,[29] and also that he could not say with any certainty that those sections of the Marina that required repair in 2014 had been fixed or replaced prior to Hurricane Irma.[30]   In fact, Ferreras was forced to concede that, in his 42 years as an engineer, he could not "provide one example where properly constructed and maintained concrete docks or finger pier failed before mooring lines securing the vessel to those structures parted or broke."   Oct. 22, 2020 Trial Tr. [ECF 310] at 212 (Ferreras).

---

explanation that crack was due to high lateral forces imposed on the vessels in that slip.  The vessel was subjected to the high hurricane loads.  It was pushed with a high degree of force, pushed and pulled and it exerted a lateral force on the dock.  The dock could not withstand it.  It wasn't designed for those kind of loads and it blew the pile cap, the pile connection apart.  As you can see the ragginess on the lower portion of that pile.").

[28]   Ferreras summarily concludes, without citing any evidence, that Hurricane Maria, which the Court finds by taking judicial notice was also a Category 5 hurricane, did not cause any further damage to the Marina.  *See, e.g.*, Oct. 22, 2020 Trial Tr. [ECF 310] at 180-81 (Ferreras) ("[O]ur opinion is that all the damages occurred in Hurricane Irma and the reason I'm basing that statement is because we didn't notice any damage from Hurricane Maria.  The winds were very low speed. It was a heavy rain event.").

[29]   *See, e.g.*, Oct. 22, 2020 Trial Tr. [ECF 310] at 188 (Ferreras) ("Q: So if you were standing on the deck, looking at this pile and pile cap or had a photograph of it from top sides, you wouldn't see what you're looking at right now, would you? A: It would be difficult to find this orientation from the deck, deck surface.").  Further, Ferreras testified that "the best way to evaluate damage is to probe it, same as a dentist goes in with a drill to take care of a cavity, until he drills it deep enough and finds out where the solid material is and you can look at it from the surface but you have to dig it out and replace back to solid."  *Id.* at 192 (Ferreras).

[30]   *See, e.g.*, Oct. 22, 2020 Trial Tr. [ECF 310] at 193 (Ferreras) ("Q: Okay.  But when you testified at deposition, you couldn't say with any certainty that any of these conditions had been addressed between the times that the photos were taken and the time Hurricane Irma struck St. Thomas, right?  A: I couldn't that's right.").

*Crown Bay Marina, L.P. v. Reef Transportation LLC, et al.,*
Civil No. 2018-73
Page 20

Finally, the Court does not find as valid Ferreras' conclusions as to causation in light of his admitted failure to follow his own methodology for forensic evaluations.[31]  When questioned about his process, Ferreras stated that it included looking at the two things that impacted and trying to put the pieces together.  Oct. 22, 2020 Trial Tr. [ECF 310] at 160 (Ferreras).  However, when asked whether he ever inspected the Reef vessels, he replied: "I did not."  *Id.* at 209 (Ferreras).  Instead, Ferreras provided the following description of the steps that he and Pomeroy took in conducting their investigation:

> We conducted a visual examination.  We walked over the entire property, recording damage that, visual damage that we could find.  We reviewed photos of the prior conditions before the storm and we compared [those photos] with what we found in place and we looked at drone footage of the property.  We tried to understand what happened and we put all that together into a report to prepare damage assessments.

Oct. 22, 2020 Trial Tr. [ECF 310] at 88-89 (Ferreras).  In other words, at no point in his testimony as to the Reef vessels did Ferreras indicate that his evaluation of damages included a physical assessment of the vessels.

In sum, CBM has failed to prove by a preponderance of the evidence that the Reef vessels caused damage to the Marina through Reef's negligence.

---

[31]  Gregorio Hernandez-Concepcion, a civil structural engineer with experience in marina structures, also criticized Ferreras' methodology, albeit for a different reason:  "[H]e needs to go and see the material and see where it failed.  Identify the section which failed.  And then he has to compute the strength of the material in that section. How much load it can take.  Compute the strength of the material in that section.  And then compute the magnitude of the load applied to that section . . . And with that information, he can come to a conclusion whether that section could fail by fatigue or not."  Oct. 29, 2020 Trial Tr. [310-4] at 194 (Hernandez).  Ferreras did not perform any calculations.  Oct. 22, 2020 Trial Tr. [ECF 310] at 196 (Ferreras).  Ferreras acknowledged that there were "unknown structural values in this marina, we don't know how the structure was built.  We don't know what the geotechnical conditions were there on the ground."  *Id.* at 197 (Ferreras).

*Crown Bay Marina, L.P. v. Reef Transportation LLC, et al.,*
Civil No. 2018-73
Page 21

## 2.        The Breach of Contract Claim

CBM contends that Reef is liable under the License Agreement and the Evacuation Protocol for damages to the Marina caused by its vessels.[32]  CBM further contends that Reef breached these agreements by failing to honor CBM's demand for payment after the vessels damaged the Marina and by failing to procure insurance naming CBM as an additional insured.[33] Even if the Court assumes that Reef is liable for damages under these contracts, as discussed above, CBM has not proven that the Reef vessels caused the damage at issue.  Thus, CBM has failed to prove by a preponderance of the evidence that Reef breached either contract.

A Judgment and Order will follow.

**Dated**: April 1, 2021                    S\_____
                                             **RUTH MILLER**
                                             United States Magistrate Judge

---

[32]  To the extent that CBM contends that Reef breached the Dayworker Agreement, the Court finds that it does not apply in the circumstances at bar.  The language of that agreement, given its plain meaning and read as a whole, is a declaration by Reef that Reef waives claims against CBM and assumes risks of injury or damage when bringing outside laborers to work on the vessel in the Marina.  *See, e.g.,* Trial Ex. 102B.  The "indemnify and reimburse" provision applies to costs CBM might incur as a result of suits or claims by third parties stemming from such activities.  The expansive reading CBM tries to give that provision, *see* [ECF 313] at 26, is not warranted.

[33]  While CBM noted this alleged breach practically in passing, the Court observes that the operative contract language requires the insurance to "cover the risks undertaken in Paragraph 10 of this Agreement."  Trial Ex. 101A at 2; Trial Ex. 102A at 2.  The risks undertaken were that the Reef vessels would damage the Marina.  Having found that CBM failed to prove that the vessels caused the damage attributed to them, this claim of alleged breach necessarily fails.