IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| CROWN BAY MARINA, L.P., ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil No. 2018-73 |
| v. ) | |
| ) | |
| ) | |
| REEF TRANSPORTATION, LLC, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is "Plaintiff [Crown Bay Marina, L.P. ("CBM")]'s Motion for Relief from Judgment" under Federal Rule of Civil Procedure ("FRCP") 60(b)(2). [ECF 334]. Defendant Reef Transportation, LLC ("Reef") filed an opposition [ECF 343] and CBM replied thereto [ECF 346]. The Court writes for the parties and so only those facts necessary for determining the motion will be addressed.

### I.   BACKGROUND

CBM is the owner of Crown Bay Marina ("the Marina"), a boat docking facility located on St. Thomas in the United States Virgin Islands. Reef is the owner of two vessels used as water taxis.

On September 5, 2017, in anticipation of Hurricane Irma making landfall on St. Thomas, Reef docked both of its vessels at the Marina. On September 6, 2017, Hurricane Irma passed over St. Thomas. CBM claims that during Hurricane Irma, both Reef vessels struck the C-Dock and its ancillary structures, causing significant damage.

On April 1, 2021, following a bench trial, the Court issued findings of fact and conclusions of law; the Court held that CBM failed to prove by a preponderance of the evidence either that

Reef's negligence caused the damage to the Marina or that Reef breached its contracts with CBM. In the instant motion, CBM seeks relief from the Court's final judgment on the basis that newly discovered evidence undercuts one of the Court's findings as to the condition of the Marina prior to Hurricane Irma. CBM contends that if the Court had been aware of this evidence at trial, it would have concluded that Reef was negligent and had breached its contracts with CBM.

## II. LEGAL STANDARDS

Rule 60 provides in pertinent part as follows: "On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding [based on] . . . newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial." FRCP 60(b)(2). Rule 60(b)(2) motions "must be made . . . no more than a year after the entry of the judgment or order or the date of the proceeding." FRCP (60)(c)(1).

The newly discovered evidence "(1) [must] be material and not merely cumulative, (2) could not have been discovered before trial through the exercise of reasonable diligence and (3) would probably have changed the outcome of the trial." *Compass Tech., Inc. v. Tseng Labs., Inc.*, 71 F.3d 1125, 1130 (3d Cir. 1995). "The movant under Rule 60(b) bears a heavy burden, which requires more than a showing of the potential significance of the new evidence." *Bohus v. Beloff*, 950 F. 2d 919, 930 (3d Cir. 1991) (citations and quotation marks omitted). Thus, courts grant relief under Rule 60(b) "only where extraordinary justifying circumstances are present." *Id.* (quotation marks omitted).

## III. DISCUSSION

A.  <u>CBM's Motion is Timely</u>

The Court entered final judgment in this case on April 1, 2021. The instant motion was filed on April 1, 2022. Therefore, CBM's motion is timely under FRCP (60)(c)(1).

*Crown Bay Marina, L.P. v. Reef Transportation, LLC, et al.,*
Civil No. 2018-73
Page 3

B.  CBM's Newly Discovered Evidence is Not Material

CBM contends that "[o]n June 23, 2021, the Kissmans [finally] turned over the server [belonging to CBM] and three boxes of [CBM] documents that had been stored at their residence in Boca Raton, Florida . . . ." [ECF 335] at 4.[1]  According to CBM, despite the Kissmans' efforts to delete "nearly all data on the server" CBM's forensic experts were able to recover "documents evidencing significant concrete repair work to C-Dock in late 2013 and mid-2014." *Id.*  CBM further avers that they were able to recover a General Ledger entry showing that in 2016, CBM paid Clyde Tapp, one of its employees, to take photographs of the Marina docks. *Id.* at 5.

CBM argues that if it had access to these documents prior to trial, it would have been able to prove that Tapp's photographs of the Marina docks, which were in evidence at trial, were taken in 2016, not 2014.  [ECF 335] at 5.  CBM further argues that because it would have been able to demonstrate that the docks "were being managed professionally with the assistance of an architect and a commercial contractor as part of the routine maintenance of the C-Dock finger piers— including the ones damaged by the Reef's vessels during Hurricane Irma," *id.*, the Court would not have ultimately found that the evidence regarding the dock's condition was "inconclusive," *id.* at 2.

Reef disagrees.  According to Reef, two of the pieces of evidence CBM contends it recently discovered from CBM's General Ledger are inconsequential.  [ECF 343] at 10.  Specifically, Reef argues that the first piece of evidence—several ledger entries—simply indicate that repairs were made to the C-Dock by HT Development, LLC ("HT") in 2013, and that the second piece of

---

[1] Dennis and Nancy Kissman are the owners of Marina Management Services, Inc. ("MMS"), the company that managed the Marina in September 2017.  After Hurricane Irma, CBM fired MMS.  According to CBM, the Kissmans retaliated against it by changing the passwords on the Marina's local server and refusing to give CBM a computer server that was kept in MMS' Florida office.  Ultimately, Dennis Kissman and MMS sued CBM's general partner, St. Thomas Marina Corporation, and St. Thomas Marina Corporation's president, Kosei Ohno.  *See Kissman, et al. v. St. Thomas Marina Corporation, et al.*, Civil No. 2018-18.

evidence—a single ledger entry—simply indicates that CBM paid Tapp $600 but does not state the reason for the payment. *Id.* Reef further notes that, without explanation, the ledger reflects that CBM simultaneously paid another individual, Daniel Radulewicz, $600 and that both $600 payments were credited back to CBM on July 31, 2016. *Id.*

The Court is not persuaded that CBM's newly discovered evidence, attached to Ohno's declaration as Exhibits 5 and 6, is material. Exhibit 5 consists of copies of ten cancelled Banco Popular de Puerto Rico ("Banco Popular") checks from CBM to HT for transactions dated 10/22/2013 through 1/10/2014. Included with the copies of the cancelled checks are what appear to be copies of corresponding invoices issued by HT for various repairs to the Marina. Following the copies of the cancelled checks and invoices are what Ohno avers are several pages from CBM's General Ledger. According to Ohno, collectively these documents consist of "specific invoices and evidence of payments relating to routine structural maintenance and repairs made to C-Dock in 2013 and again in 2014," as well as "general ledger entries showing payment to Tapp." [ECF 336] ¶¶ 19, 20.

Regarding Exhibit 5, the Court finds that only five of the ten invoices expressly refer to concrete repairs to the C-Dock;[2] the other invoices reference repairs to retail spaces located near the Marina such as "Scoops and Brew" and "Style a Dog."[3] Further, as to those invoices that reference repairs to the C-Dock, it is unclear what specific areas of the C-Dock were repaired. Lastly, regarding Exhibit 6, while the General Ledger entry reflects a payment of $600 to Tapp, not only does the entry fail to indicate what the payment was for, but it also appears as though the $600 payment to Tapp was subsequently voided. *See* [ECF 336-6] at 2.

---

[2] *See, e.g.*, [ECF 336-5] at 3, 4, 6, 10, and 11.

[3] *See, e.g., id.* at 22, 24.

Even if the Court were to accept CBM's claims regarding the descriptions of the evidence, it is unclear why this information is material to CBM's case. In its Memorandum Opinion, the Court made the following findings of fact as to the condition of the Marina prior to Hurricane Irma:

> 22. In 2014, Clyde Tapp, a Marina employee, took underwater and water level photographs of various structures at the Marina. These photographs depict areas of the marina, including the C-Dock and its pilings and piling caps, containing cracked and deteriorated concrete and rusted rebar.
>
> 23. From the time Tapp took the photographs up to the time of Hurricane Irma, CBM did no structural piling work and little to address the conditions shown in the photographs, other than filling small cracks or other minor repairs.
>
> 24. In October 2015, CBM contacted Mark Knopf, a marine contractor, about replacing the fender pilings around the C-Dock.
>
> 25. On August 17, 2016, Knopf sent CBM an estimate to replace the wooden fender piles on both sides of the C-Dock.
>
> 26. On August 25, 2016, Kissman emailed Knopf to let him know that CBM was going to hold off making any repairs to the Marina until late Spring or early Summer of 2017.
>
> 27. On May 20, 2017, Knopf emailed Kissman alternative options and corresponding estimates for replacing the three-pile dolphins at the C-Dock and for other potential repairs.
>
> 28. On August 9, 2017, Kissman emailed Knopf to let him know that all preparations Knopf was making for repairs to the Marina were to be put on hold per Ohno.
>
> 29. On September 5, 2017, the day before Hurricane Irma hit St. Thomas, Herman van der Heide took ground level and aerial photographs of the Marina.

*Crown Bay Marina, L.P. v. Reef Transp., LLC*, 2021 WL 1244011, at *2-3 (D.V.I. Apr. 1, 2021) (citations omitted). Thus, even if the Court accepts that Tapp's photographs were taken in 2016

rather than 2014 and that certain repairs were made to the C-Dock in 2013-2014, that would not have affected the Court's finding that "the evidence regarding the condition of the C-Dock and its ancillary structures immediately preceding Hurricane Irma was inconclusive." *Id.* at *11. Further, even if the Court accepts that in 2016, the C-Dock and its ancillary structures were in the condition of disrepair depicted in Tapp's photographs, the Court would still have found—in conjunction with its other conclusions regarding Reef's lack of negligence and the Court's inability to fully credit the testimony of Ferreras, CBM's expert witness—that the Reef vessels were not the proximate cause of the damages CBM complained of following Hurricane Irma. In sum, the existence of CBM's newly discovered evidence does not alter the Court's calculus as to the condition of the C-Dock immediately prior to Hurricane Irma.

C. <u>CBM Could Have Discovered the Evidence Prior to Trial Through the Exercise of Reasonable Diligence</u>

CBM argues that the Kissmans deliberately withheld and destroyed multiple accounting records that were stored on CBM's deleted server. [ECF 335] at 7. According to CBM, despite being denied access to its own server by the Kissmans, CBM made numerous attempts to obtain the documents, including requesting them directly from the Kissmans, requesting them indirectly from the Kissmans through intermediaries, and seeking to question Dennis Kissman about his handling of CBM's books and records at his deposition in this case, which took place in December 2019 and January 2020. *Id.*

Reef disputes CBM's assertion that it was unable to obtain, through reasonable diligence, the evidence it now seeks to proffer. [ECF 343] at 6-13. Regarding the condition of the C-Dock near the time Hurricane Irma struck on September 6, 2017, Reef maintains that CBM could have presented relevant evidence at trial. *Id.* at 7. For example, Reef notes that on July 27, 2017, Ohno and Felix Dubois, CBM's maintenance lead, inspected the Marina and concluded that "there was

no deferred maintenance on C-Dock." *Id.* (quotation marks omitted). Reef therefore argues that CBM could have called Dubois as a witness at trial and notes that Dubois was listed on CBM's trial witness list as an individual with knowledge of "[t]he condition of the marina slips and docks immediately before Hurricane Irma." *Id.* (quotation marks omitted). In addition, Reef avers that although CBM also listed CBM employees Liza Lord and Heidi Taylor on its trial witness list as additional individuals with the same knowledge, CBM failed to call either one of them as witnesses. *Id.* at 7.

Regarding CBM's efforts to obtain its own General Ledger, Reef argues not only that CBM was clearly aware of its existence prior to obtaining it in June 2021 (as evidenced by the fact that CBM requested the document on multiple occasions from the Kissmans and MMS), but also that CBM failed to subpoena the General Ledger from Kissman in the instant case. [ECF 343] at 10-11. Reef further avers that the Kissmans apparently "produced the General Ledger to CBM" on three prior occasions in relation to the ongoing litigation between them. *Id.* at 11. According to Reef, the Kissmans produced a hard copy of the General Ledger on July 18, 2018; "a human readable DVD" in January 2021; and a copy of CBM's server in June 2021. *Id.* In addition, Reef argues that although receipt of the metadata associated with the electronic version of the General Ledger may have significance in the Kissman litigation, a paper copy of the documents would have satisfied CBM's evidentiary needs in the instant matter. *Id.* at 11-12.

Lastly, regarding CBM's ability to obtain copies of its own cancelled checks issued to HT, Reef argues that CBM could easily have subpoenaed the records from Banco Popular. [ECF 343] at 12-13. Further, Reef contends that CBM could then have subpoenaed any construction companies that received payments for proposals or invoices related to any work done on the C-

Dock in 2013. *Id.* at 13. In Reef's view, therefore, "CBM's litigation decisions and strategy do not demonstrate the [requisite] 'reasonable diligence'" under Rule 60(b). *Id.*

Assuming the materiality of CBM's newly discovered evidence, the Court is not persuaded by CBM's argument that it was unable to obtain it prior to trial through the exercise of reasonable diligence. First, CBM could, as Reef contends, have called Dubois, Lord, and Taylor to testify as to the condition of the docks immediately prior to Hurricane Irma. Further, although CBM argues in its reply that none of these witnesses could have testified "as to the date that the docks were last repaired or whether the conditions in Tapp's photos had been allowed to worsen over the course of three years," it is unclear whether CBM assumed their lack of knowledge or came to this conclusion after deposing them. CBM describes Dubois as being "highly skilled and competent as a maintenance lead," and identifies Lord and Taylor as individuals who worked in the Marina office. [ECF 346] at 4. It seems highly unlikely that, despite English not being Dubois' native language, despite Dubois not being responsible for work performed underneath the docks, and despite Lord and Taylor working in the Marina office rather than on the docks, none of these individuals had any information whatsoever about the condition of the Marina in the period leading up to the 2017 storms. At a minimum, CBM could have deposed these individuals to ascertain what they knew or didn't know.[4]

Second, CBM could have subpoenaed the Kissmans in this case for a copy of the General Ledger as well as any documentation (bank records and invoices) regarding repairs to the Marina during the relevant years prior to Hurricane Irma. CBM's suggestion that the information it needed

---

[4] CBM's assertion that Dubois' "first language is the French-based St. Lucian Creole, and he cannot read English well enough to search for documents or to provide a written narrative of past events," [ECF 346] at 4, is no excuse. CBM could have obtained a translator for purposes of deposing Dubois, especially given his position at the Marina as "a maintenance lead."

was somehow unavailable because Reef's attempts at obtaining the same documents were unsuccessful is not persuasive given that Rule 60(b)(2) requires the movant to demonstrate the exercise of reasonable diligence, not the movant's opponent. Further, although CBM avers that "none of the three partial productions of the General Ledger in the Kissman case included any of the Withheld Invoices," CBM does not deny that it had a hard copy of the General Ledger in 2018 or that it was able to recover the relevant invoices after restoring the server. [ECF 346] at 6.

C.  Whether CBM's Newly Discovered Evidence Would Have Changed the Outcome of the Trial

CBM argues that the General Ledger "demonstrates conclusively that Tapp's photos were taken in mid-2016, not 2014." [ECF 335] at 7. According to CBM, this would have demonstrated to the Court that CBM had not permitted the docks to simply deteriorate during the three years prior to the 2017 hurricanes. *Id.* at 7-8. CBM further contends that certain withheld invoices show that it hired AllRepair to make repairs to C-Dock in 2013 and again in 2014, thus demonstrating that CBM was actively engaged in maintaining the condition of the C-Dock prior to the 2017 storms. *Id.* The Court would not, CBM surmises, have considered the condition of the docks relevant to its assessment of the damage caused by the Reef vessels; instead, the Court would have concluded that the reason the docks were damaged was because of Reef's failure to properly secure its vessels prior to the storms. *Id.* at 10-11.

Reef maintains that even if CBM had been able to introduce its newly discovered evidence, this would not have affected the Court's conclusions regarding the condition of the docks immediately before Hurricane Irma. [ECF 343] at 14-15. According to Reef, none of this evidence changes the fact that the evidence adduced at trial established that Ohno was aware in 2017 that the C-Dock needed certain repairs but decided not to have them done at that time. *Id.* at 15.

The Court ultimately concludes that CBM's newly discovered evidence, even if deemed material and even if CBM could not have discovered it prior to trial through the exercise of reasonable diligence, would not have changed the outcome of the trial. At trial, CBM argued that Reef was negligent in the manner it moored its two vessels in the Marina. According to CBM, the Reef vessels damaged the Marina either by making direct contact with the C-Dock and its ancillary structures or by exerting stress on them through the vessels' movements during Hurricane Irma. The Court found that neither Reef vessel came into contact with either the C-Dock or the C10/C12 finger pier. *Crown Bay Marina, L.P.*, 2021 WL 1244011, at *11. Next, the Court reasoned that even if the vessels did come into contact with the C-Dock, Reef successfully rebutted the presumption of negligence imposed by the *Louisiana* Rule. *Id.*[5] To wit, the Court held that Reef "was only required to take those measures that a mariner exercising reasonable care in those circumstances would have taken," and that Reef had done so. *Id.* Significantly, the Court noted that both Reef "vessels survived Hurricane Irma virtually intact . . . [both] remained in their respective slips during the storm, neither vessels' lines parted, and neither vessel sank." *Id.* Lastly, the Court concluded that even if the evidence demonstrated negligence on Reef's part, "the evidence [did not] establish that the Reef vessels were the proximate cause of the damages CBM complain[ed] of . . . in part because the evidence regarding the condition of the C-Dock and its ancillary structures *immediately preceding Hurricane Irma* was inconclusive." *Id.* (emphasis added). In sum, even if Tapp's photographs of the C-Dock were taken in 2016, after structural repairs were made in 2013-2014, the Court would not have been able to ascertain with any greater

---

[5] As this Court previously explained, "[u]nder the *Louisiana* Rule, when a vessel moving as a result of an external force such as a current or wind allides with a stationary object, the moving vessel is presumptively at fault." *Crown Bay Marina, L.P.*, 2021 WL 1244011, at *9.

certainty the condition of the C-Dock and its ancillary structures immediately prior to Hurricane Irma.

Lastly, this newly discovered evidence in no way addresses the Court's criticisms of Ferreras' expert opinion—(1) that his assessment was based on a comparison of photographs taken the day before Hurricane Irma with ones taken two months after Hurricanes Irma and Maria, when the Reef vessels were not longer at the Marina; (2) that Ferreras' physical inspection of the Marina did not include an examination of underdeck or underwater structures; (3) that Ferreras could not confirm that sections of the Marina requiring repair in 2014 had been fixed prior to Hurricane Irma; and (4) that Ferreras admitted that he never physically inspected the Reef vessels prior to preparing his damage assessment. Further, CBM's newly discovered evidence does not refute Ferreras' concession that, "in his 42 years as an engineer, he could not provide one example where properly constructed and maintained concrete docks or finger piers failed before mooring lines securing the vessel to those structures parted or broke." *Crown Bay Marina, L.P.*, 2021 WL 1244011, at *12 (quotation marks omitted).

## IV. CONCLUSION

Accordingly, the premises considered, it is ORDERED that "Plaintiff's Motion for Relief from Judgment" [ECF 334] is DENIED.

**Dated**: August 17, 2022          S\_____
                                    **RUTH MILLER**
                                    United States Magistrate Judge